Filed 9/30/24  Carmel Development Company v. Monterra Ranch Properties CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CARMEL DEVELOPMENT COMPANY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MONTERRA RANCH PROPERTIES, LLC et al., <br><br> Defendants and Appellants. | H050094 & H050530 <br> (Monterey County <br> Super. Ct. No. M91899) |

This is defendants' second appeal involving their residential development project in Monterey County.  Defendants' first appeal was resolved by a published decision in *Carmel Development Co., Inc. v. Anderson* (2020) 48 Cal.App.5th 492, 498 (*CDC I*) . As we explained in our previous opinion, plaintiff Carmel Development Company, Inc. provided design and construction work for defendants' Monterra subdivision over the course of more than 10 years under an oral contract with property owner Roger Mills, the principal of Monterra Ranch Properties, LLC (Monterra LLC).  Plaintiff recorded a mechanic's lien and a site improvement lien against certain lots in the subdivision after being informed that Monterra LLC would no longer be able to continue paying for plaintiff's work.  Plaintiff sued several of Monterra LLC's investors with property interests in unsold lots in the development (defendants Larry Anderson et al.) as well as the LLC.  Plaintiff alleged causes of action for, among other things, breach of contract and foreclosure of the mechanic's and site improvement liens.  Monterra LLC stipulated

to liability before trial; the investor defendants contested liability in a lengthy bench trial that resulted in a judgment for plaintiff.

In *CDC I*, we reversed the judgment and remanded the matter for the limited purposes of subtracting sums associated with any contractual interest included in the liens; determining the precise number of lots that benefited from the mechanic's lien for water infrastructure improvements; and recalculating prejudgment interest. (*CDC I*, *supra*, 48 Cal.App.5th at pp. 527–528.) On remand, the trial court heard additional evidence and entered a new judgment. Defendants have again appealed, asserting error by the trial court in not including all lots that benefited from the water infrastructure improvements; excluding testimony from defendants' expert on contractual interest; sanctioning defendants for not admitting certain facts in discovery; and denying defendants' peremptory challenge after appellate reversal of the judgment (Code Civ. Proc., § 170.6). For the reasons stated here, we will modify the judgment to add two lots to the Water Lien calculation and will affirm the judgment as modified.

## I.    TRIAL COURT PROCEEDINGS

### A. PROJECT HISTORY AND DEVELOPMENT AGREEMENT

We reproduce this section verbatim from *CDC I* to provide relevant background. Our review of the trial court's decision in this appeal is based on the evidence the trial court considered in the limited trial on remand.

"The Monterey County Board of Supervisors approved a 2,911-acre subdivision known as Monterra in 1987. Brothers Roger and Basil Mills formed Monterra LLC and purchased the undeveloped Monterra subdivision in 1995. After Monterra LLC acquired the Monterra subdivision, the owners of the Tehama subdivision (located immediately south of Monterra) entered into an agreement with Monterra LLC. Among other things, the agreement provided that Monterra LLC would transfer about 1,000 acres from Monterra to Tehama to create Cañada Woods North (where a golf course and a small number of residential units were to be built). Tehama would also allow lots in Monterra

2

to use Tehama's graywater sewage treatment system, and Monterra LLC would construct a potable water system to be used by lots in Monterra and Cañada Woods North.

"Monterra LLC hired plaintiff via a handshake agreement to redesign Monterra as an 'exclusive and environmentally-friendly development.' The trial court found that the agreement was as follows: for design work plaintiff would charge its billing rate, actual consultant charges, and a 5 percent markup applied to the consultant charges; for construction work plaintiff would charge its actual costs for equipment and labor performed by plaintiff as well as the actual costs of its subcontractors and materialmen, plus a 25 percent markup of the construction labor costs to account for supervision, overhead, and profit.

"Plaintiff developed Monterra between 1996 and 2008. That development work included 'lot design and layout, locating building envelopes on each lot, water and sewage system layout and design, roadway design, construction and repair.' Plaintiff developed Monterra in phases in order to build and sell a few houses at a time to raise capital to invest in each successive phase. Roughly half the lots in Monterra were developed and sold before Monterra LLC ran out of capital; those sales generated over $100 million. Part of the development included construction of a reverse osmosis water plant, which served the lots in the subdivision that had been sold to third parties.

"Plaintiff and Monterra LLC entered into an oral contract providing for contractual interest in late 2000. Monterra LLC agreed to pay interest on unpaid balances at the rate of 10 percent. The trial court found that interest was 'to accrue 60 days from the last day of the month in which the work was performed.' (In determining the accrual period, the trial court acknowledged that trial testimony on that point was 'often unclear, confusing and conflicting.')

3

"Monterra LLC informed plaintiff in 2008 that it could no longer make payments, effectively breaching the contract. Plaintiff recorded two liens[1] to secure its right to money for two categories of work: water improvements throughout Monterra, and site improvements in phases seven and nine. The water lien (Water Lien) was for water improvements 'related to the expansion of a water and sewer system including the installation of new wells, lift stations and a larger reverse osmosis water plant to increase the water and sewer systems capacity to provide services to the last 85 unsold lots of the Monterra subdivision.' The site improvement lien (Site Improvement Lien) 'related to the installation of site improvements (roads, driveways, retaining walls, utilities) to benefit the lots located in Phases 7 and 9 of Monterra.' " (*CDC I*, *supra*, 48 Cal.App.5th at pp. 499–500.)

## B. REMAND INSTRUCTIONS FROM *CDC I*

As relevant here, the court in *CDC I* concluded that the Water Lien and Site Improvement Lien could not include contractual interest because the trial court found that the contract price (without interest) and the reasonable value of the liened lots were equal. (*CDC I*, *supra*, 48 Cal.App.5th at pp. 520–522.) *CDC I* also concluded that because the water infrastructure improvements were a single work of improvement designed to be an integrated whole serving all lots in Monterra, the Water Lien had to be allocated to all lots in the development. (*Id.* at pp. 509–513.) The matter was reversed and remanded for additional factfinding on those issues.

The opinion in *CDC I* provided the following guidance to the trial court for a limited trial on remand: "The trial court's first task involves both liens. The court must recalculate the amount of the Site Improvement Lien and Water Lien after subtracting sums associated with any contractual interest included in the liens as a result of Monterra LLC's agreement to pay plaintiff contractual interest. To the extent the parties are unable

---

[1] What we will refer to as the water lien was recorded as several separate liens, one lien per relevant project phase.

to stipulate to a new calculation based on the existing record, additional expert testimony may be necessary. Once the new lien totals are determined, the trial court must divide the amount of the Site Improvement Lien among the lots in phases seven and nine.

"The trial court's second task involves only the Water Lien. The court must determine the precise number of lots that benefited from the Water Lien. We can state with certainty based on the record before us that at minimum all lots within Monterra benefited from the Water Lien improvements. The parties dispute whether the Water Lien also includes balances due for improvements benefiting lots outside Monterra (i.e., lots owned by Tehama in either Tehama or Cañada Woods North). The parties appear to agree that certain water infrastructure improvements benefited lots owned by Tehama, but disagree regarding whether the Water Lien itself contains amounts associated with lots outside Monterra. (Defendants argue the Water Lien includes charges for improvements benefiting Tehama, whereas [Alan] Williams testified that Tehama was billed separately for water infrastructure.) Upon resolving that factual dispute and determining the total number of benefited lots, the court must divide the new Water Lien total by the number of benefited lots. Each of the 58 lots listed in the original judgment in this case will then be responsible for that lot's pro rata share of the Water Lien. (Plaintiff acknowledges its recovery is limited to those 58 lots, noting in its cross-appeal that it is 'not arguing that it should be permitted now to recover from the sold lots their proportionate share of the water lien, only that in making the calculations on a remand, the Water Lien would first have to be allocated across the 171 lots to determine each benefitted lot's proportionate share (i.e., 1/171th) of the water lien.')

"Prejudgment interest at a rate of 7 percent must then be added to the newly calculated amounts for both liens, with a starting date of June 26, 2009 (the date already selected by the trial court). (Cal. Const., art. XV, § 1.)" (*CDC I*, *supra*, 48 Cal.App.5th at pp. 527–528.)

5

## C. REMAND PROCEEDINGS

Defendants attempted to disqualify the judge who heard the original trial. After their peremptory challenge under Code of Civil Procedure section 170.6 was denied, a different panel of this court summarily denied defendants' petition for writ relief from that decision. (Case No. H048473.)

Plaintiff served defendants with two requests for admission that are relevant to this appeal. The first asked defendants to admit: "Superior Court Judge Thomas Wills held, as stated in the Statement of Decision filed on December 12, 2013 in this CASE, that the amount due to Plaintiff under the CONTRACT between Plaintiff and Monterra Ranch Properties, LLC as of March 31, 2008 was the sum o[f] $2,283,337.65." The second asked defendants to admit: "The sum of $2,283,337.65 as described in Admission No. 1 contained unpaid interest in the amount of $1409.74." Defendants denied both requests for admission.

The trial court heard testimony over multiple days about the remand issues identified in *CDC I*. The parties also read into the record deposition testimony and testimony from the first trial. The court struck the testimony of defendants' expert witness about contractual interest, finding his testimony irrelevant because it did not follow the appellate court's instructions in *CDC I*. (We will summarize the relevant evidence in our later discussion.)

The trial court decided the remand issues in a written order. The court found the testimony of Vanessa Hill, plaintiff's forensic accounting expert, about removing contractual interest from the lien amount to be "credible, persuasive and in accordance with the directive of the Court of Appeal." The court found that the combined lien amount of $2,283,337.65 contained $1,409.74 in contractual interest. Subtracting that interest, the court concluded the total combined lien amount without contractual interest was $2,281,927.91.

6

The court found that 181 lots benefited from the Water Lien. That amount included the 171 Monterra lots discussed in *CDC I* plus 10 lots in Cañada Woods North that the parties stipulated on remand should be subject to the Water Lien.

The court determined that 42 affordable "inclusionary" housing units referred to as the Oak Tree subdivision "were a separate and prior work of improvement and not a part of the work of improvement which gave rise to the Plaintiff's water lien." The units were a separate subdivision sold by Monterra to another entity in 1997.

The court also concluded no additional Tehama lots benefited from the Water Lien other than the 10 lots stipulated by the parties. Tehama was separately invoiced by plaintiff for construction work, and no work for Tehama was included in the Water Lien. Although the Tehama golf course uses greywater from the Monterra subdivision, it purchases the "effluent from the water company serving the developments." There was no evidence that Tehama obtains that water cost free or at a discounted rate.

The court further concluded that work on four water tanks near lot 69 was not part of the Water Lien. The court found, based on defense expert Strombom's report in the first trial, that work on the Water Lien occurred between September 2007 and March 2008. The court found plaintiff constructed the four tanks before that date range. Two tanks serve Monterra, and two serve Tehama. Tehama was separately billed for the two tanks serving its lots. The court found the "Tehama lots served by the two water tanks for which Tehama paid are not a portion of the single work of the Monterra improvement and are not subject to the water lien at issue here."

Of the $2,281,927.91 total lien amount, the court attributed $132,580 to the site improvement lien and $2,149,347.90 to the Water Lien, based on Hill's calculations. Dividing $2,149,347.90 by 181 lots yielded a Water Lien allocation of $11,874.85 per lot. $11,874.85 multiplied by the 58 remaining lots equaled a total of $688,741.30 for the Water Lien after reallocation. $688,741.30 plus the $132,580 site improvement lien equaled a total combined lien share of $821.321.30 for the subject lots. With costs,

7

prejudgment interest, and postjudgment interest as of October 31, 2021, the court found the total amount of the judgment as of that date was $1,990,798.80. Judgment was entered in April 2022, and defendants appealed that judgment in case No. H050094.

### D. DISCOVERY SANCTIONS

Plaintiff moved to recover its attorney fees for proving the two requests for admission refused by defendants. (Code Civ. Proc., § 2033.420.) The trial court granted the motion by written order after a hearing, finding that the facts were of substantial importance to the issues on remand and that defendants denied the facts without a reasonable belief that they would disprove them. The court ordered defendants to pay plaintiff $39,125 in attorney fees for proving the facts and $26,150.50 in attorney fees related to the fee motion. The court also ordered defendants to pay $18,598.45 for plaintiff's expert witness and $78.10 for expenses related to the motion. Defendants appealed that postjudgment order in case No. H050530. We ordered the two appeals considered together for briefing, oral argument, and disposition.

## II.    DISCUSSION

### A. PLAINTIFF'S MOTION TO STRIKE

Plaintiff moved to strike portions of the appellant's appendix that were not presented to the trial court during the remand proceedings, as well as the portions of defendants' opening brief relying on that material. The trial court made clear during the remand proceedings that although evidence and testimony from the original trial was potentially admissible at the remand hearing, any evidence to be relied on by the parties was to be presented "here in the courtroom." The court emphasized it did not want to "take this case under submission with somebody telling me here, Judge, read this thousand pages in the spare time that you don't have before you come up with a decision." Defendants have not challenged that ruling on appeal. In reviewing whether the trial court's decision is supported by substantial evidence, we will consider only the

8

evidence presented to the trial court in the remand proceedings.  Plaintiff's motion to strike is denied.

### B.  THE CODE OF CIVIL PROCEDURE SECTION 170.6 MOTION

"[D]etermination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought only by the parties to the proceeding."  (Code Civ. Proc., § 170.3, subd. (d); see *People v. Panah* (2005) 35 Cal.4th 395, 444 ["As we have repeatedly held, the statute means what it says:  Code of Civil Procedure section 170.3, subdivision (d) provides the exclusive means for seeking review of a ruling on a challenge to a judge, whether the challenge is for cause or peremptory."].)

A different panel of this court summarily denied defendants' petition for writ relief after the trial court denied their Code of Civil Procedure section 170.6 motion.  (Case No. H048473.)  Defendants did not petition for review of that decision in the Supreme Court; the issue is not cognizable on appeal.

### C.  ALLOCATING THE WATER LIEN

Defendants argue the trial court should have included several additional lots in the Water Lien allocation—an argument they nearly forfeited by not identifying the relevant standard of review, not summarizing the facts adduced at the remand hearing, and merely listing dozens of reporter's transcript pages at the end of lengthy factual recitations without more specifically identifying the cited testimony.  Defendants also rely on evidence to support their arguments without acknowledging the evidence the trial court actually relied on to make its decision.  (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287 ["Rather than scour the record unguided, we may decide that the appellant has waived a point urged on appeal when it is not supported by accurate citations to the record."]; *Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408 [an appellant "who cites and discusses only evidence in her favor fails to demonstrate any error and waives the contention that the evidence is insufficient to support the

9

judgment."].)  In the interest of finality, we have reviewed the evidence and will determine whether substantial evidence supports the trial court's decision that the Water Lien should be allocated to 181 lots identified.  (*CDC I*, *supra*, 48 Cal.App.5th at p. 507 ["Because determining the amount of land benefited by a mechanic's lien requires a trial court to resolve disputed evidence and make factual findings, we apply the substantial evidence standard of review."].)  We will address each of the five categories of parcels defendants contend should have been included in the Water Lied allocation.

As we described in *CDC I*, *supra*, 48 Cal.App.5th at pp. 506–507 , plaintiff was authorized to record "a lien upon the property upon which [it] bestowed labor or furnished materials ... for the value of such labor done or materials furnished."  (Civ. Code, former § 3110[2]; see also Cal. Const., art. XIV, § 3 ["Mechanics, persons furnishing materials, artisans, and laborers of every class, shall have a lien upon the property upon which they have bestowed labor or furnished material for the value of such labor done and material furnished."])  The lien attaches to "the work of improvement and the land on which it is situated together with a convenient space about the same or so much as may be required for the convenient use and occupation thereof." (Civ. Code, former § 3128.)  As to the geographic scope of a mechanic's lien, the " 'question is not so much as to the amount of land required for the area to be occupied by the [improvements], but rather as to the amount of land to be improved or benefited by the creation and use of the [improvements].' "  (*Cal. Corrugated Culvert Co. v. Stewart* (1934) 220 Cal. 104, 106–107 (*Cal. Corrugated*) [lien for construction of a rice elevator and a barn applied to entire farm property because the improvements benefited the whole farm].)  Determining the scope of a lien "must take into consideration the intended use for which the

_____

[2]  The Civil Code sections related to mechanic's liens were repealed, renumbered, and reenacted, effective July 1, 2012.  (Civ. Code, § 8052, subd. (a); Stats. 2010, ch. 697, §§ 16, 20.)  The former Civil Code sections govern this matter because the liens were recorded before the effective date of the new law.

10

[improvement] is erected. ... [I]f its use is dependent upon, and connected with the uses made of other buildings or the uses made of other portions of the tract of land upon which it is situate[d], then if all of the larger tract is required for the 'necessary and convenient use' of the [improvement] involved, such larger tract may properly be included." (*Anselmo v. Sebastiani* (1933) 219 Cal. 292, 298 (*Anselmo*); accord, *CDC I*, 48 Cal.App.5th at pp. 506–507.)

### 1. Inclusionary Housing Lots

The trial court concluded the 42 inclusionary housing lots should not be included in the Water Lien allocation because they "were a separate and prior work of improvement and not a part of the work of improvement which gave rise to the Plaintiff's water lien." William Silva testified at the remand trial that he oversaw construction of the inclusionary housing units. The 42 inclusionary housing units were a condition of county approval for the Monterra development. The inclusionary housing units needed to be built before any Monterra properties could be sold. The Mills sold lots 1 through 42 to Oak Tree Housing, a limited partnership created by Silva for the purpose of building the inclusionary housing units. A grant deed recorded in January 1997 reflects the transfer. Silva testified that the agreement with Mills required Silva's partnership to build and sell the inclusionary housing units within 18 months. Silva's partnership was responsible for building all water and sewer infrastructure on the 42 inclusionary housing lots, which would connect to infrastructure being built on the Monterra property by the Mills. The Mills were responsible for "bringing the water to" the inclusionary housing lots. By the time the last inclusionary housing lot sold in 1998, water and sewage services were being supplied to all inclusionary housing units. A water subsidization agreement was signed to ensure that inclusionary housing units would receive water at reasonable rates.

Alan Williams, the principal of plaintiff Carmel Development Company, agreed with defendants' counsel's question that a vicinity map showed "four separate projects, there would be the inclusionary housing, there would be Monterra, there would be

11

Cañada Woods North and then there would be Tehama proper." Williams testified that his company performed no work on the inclusionary housing lots, and that water infrastructure on Monterra land connected to water infrastructure on the inclusionary housing lots. Williams acknowledged that a water system was engineered to treat sewage both from the inclusionary lots and from Monterra. Plaintiff built a reverse osmosis plant in the late 1990's to serve Monterra and the inclusionary lots, and that system had been completed and paid for in full.

The reverse osmosis plant is distinct from the High Well Water Treatment Plant, which was constructed in the late 2000's. It is undisputed that the Water Lien includes charges for the construction of the High Well Water Treatment Plant, which was not yet operational when the Water Lien was recorded. The parties stipulated that the "High Well Water Treatment Plant (and related infrastructure of pipes, wells, pumps, etc.) is currently providing water to the customers of the Cañada Woods Water Company whose service area contains the 171 lots within Monterra, the 42 lots of inclusionary housing, and 10 lots within Cañada Woods North."

The foregoing provides substantial evidence to support the trial court's decision that the inclusionary housing units were a separate work of improvement. Construction of the units was severed from the Monterra project when the land was sold to Silva's limited partnership in 1997, and plaintiff was not involved with construction on the inclusionary housing lots. The inclusionary lots were all sold by 1998, at which time they all had operational water and sewage services.

Defendants' appellate argument does not grapple with the substantial temporal separation between completion of the inclusionary housing units and the work that formed the basis of the Water Lien. Defendants note that Monterra was responsible for supplying water and sewage services to the inclusionary housing units. Defendants then assert that the "42 homes that were built on the 'inclusionary housing' parcels could not be sold until CDC and Chapin completed the water and sewer infrastructure that is the

12

subject of the Water Lien."  The assertion that the Water Lien infrastructure had to be completed before the inclusionary housing could be sold is not supported by the record: Silva testified that the inclusionary lots were all sold—complete with functioning water and sewer service—nearly a decade before the work that formed the basis for the Water Lien.

Defendants suggested at oral argument that the inclusionary housing units are part of the Monterra work of improvement as a matter of law based on findings from the first trial and *CDC I*.  We see nothing in the trial court's original findings or the opinion in *CDC I* that compels such a result.  According to the statement of decision after the first trial, the trial court determined Monterra's "infrastructure, particularly the sewage and water system, was designed to be an integrated whole serving all the lots in each phase, no phase of which could have operated independently of the others."  The trial court made that finding to resolve a dispute between the parties about whether project phases *within the Monterra subdivision* were separate works of improvement.  We observed in *CDC I* that the "Monterra water system was designed to be an integrated whole serving the entire subdivision."  (*CDC I*, *supra*, 48 Cal.App.5th at p. 508; see also *id.* at p. 509 ["Substantial evidence supports the trial court's conclusion that the Water Lien improvements benefited all lots in Monterra."].)  But *CDC I* did not discuss the inclusionary housing units.  Substantial evidence from the remand trial supports a finding that the inclusionary housing units were not part of the Monterra subdivision and were instead a separate work of improvement.  The inclusionary housing units being a separate work of improvement also forecloses defendants' argument that the Water Lien for work performed between 2007 and 2008 relates back to the period before the inclusionary housing was sold to the Oak Tree Housing limited partnership in 1997.  (Citing *Forsgren Associates, Inc. v. Pacific Golf Community Development LLC* (2010) 182 Cal.App.4th 135, 146 ["Although the claim of lien may be recorded after the work is completed, the lien relates back to the date the first labor or material was furnished for

13

the work of improvement, and transferees who take an interest in the property after work has begun, and before the claim of lien is recorded, take subject to the lien."].)

Defendants appear to contend that the inclusionary housing units benefited from the Water Lien improvements because the High Well Water Treatment Plant now provides water to those inclusionary units. But the trial court could reasonably conclude that any benefit the inclusionary housing units derive from that service is by virtue of being part of the same water utility as Monterra, a service that the inclusionary housing units pay for.

Defendants argue "the facts of this case make clear that [the inclusionary housing] was part and parcel of the same overall 'work of improvement' " as Monterra. Defendants point to evidence they argue indicates the developers "considered themselves to be working on a single work of improvement that included the 'inclusionary housing' component of the project." But the trial court found that Monterra and the inclusionary housing units were separate works of improvement, and we have summarized the evidence supporting that decision. Because substantial evidence supports the trial court's decision, the existence of other evidence in the record that arguably could support an alternative finding does not lead to reversal. (See *City of San Buenaventura v. United Water Conservation District* (2022) 79 Cal.App.5th 110, 120 ["We may not reweigh a judgment 'supported by substantial evidence even if substantial evidence to the contrary also exists.' "].)

Some of the purportedly contrary evidence defendants reference in their briefing is not supported by the record references they cite. For example, defendants contend that "Williams admitted that some of the unpaid work CDC seeks to collect in this action was directly related to CDC's work on the 'inclusionary housing' portion of the development." To the contrary, Williams testified in the cited deposition testimony that plaintiff built the reverse osmosis water plant to serve the inclusionary housing units somewhere between 1997 and 1999. Although Williams provided that answer in

14

response to being asked about the "water improvements work that you haven't been paid for," his answer indicates he mentioned the reverse osmosis plant to describe "the early phases" of the project. Elsewhere, Williams testified that plaintiff was paid in full for the reverse osmosis plant. And the Strombom defense expert report from the first trial that the trial court relied on in its remand decision indicated the unpaid work forming the basis for the Water Lien occurred in 2007 and 2008.

Defendants' argue that Monterra and the inclusionary housing units must be considered a single work of improvement because plaintiff and another construction company "started their site improvement work on the Monterra project—including on-site at the 'inclusionary housing' parcels—by no later than May 1996." Defendants contend that because that work began before the inclusionary housing lots were sold to the other developer, they must be considered the same work of improvement as Monterra. Defendants cite deposition testimony by Williams that his company "first [became] involved in the actual construction work on the Monterra Ranch project" in May 1996. That testimony does not establish plaintiff performed any work on the inclusionary housing lots at that time. And any work plaintiff completed on Monterra land to supply water and sewer services to the inclusionary housing lots was paid for almost a decade before the work that formed the basis for the Water Lien. We reject defendants' contention that the inclusionary housing units—a legally separate subdivision that pays for water and sewer services—must be part of the allocation for water infrastructure work on an adjacent subdivision that was installed years later to serve the increased needs of the adjacent subdivision.

### 2. The Tehama Golf Course

The trial court excluded the Tehama golf course from the Water Lien allocation because Tehama was separately invoiced by plaintiff and no work for Tehama was included in the Water Lien. Though the Tehama golf course uses greywater from the Monterra subdivision, it purchases that "effluent from the water company serving the

15

developments." There was no evidence that Tehama obtains greywater cost free or at any discounted rate.

Williams testified that, other than the 10 lots in Cañada Woods North that the parties stipulated on remand should be included in the Water Lien, no other Tehama lot is served by the Monterra water infrastructure. Williams acknowledged that Tehama purchases greywater from Monterra that is then treated at Tehama's treatment plant and used to irrigate the golf course. Williams also acknowledged that the greywater Tehama purchases from Monterra flows by necessity through the Monterra wastewater infrastructure to reach Tehama.

Substantial evidence supports the trial court's decision to exclude the Tehama golf course from the Water Lien allocation. There is no evidence of any Monterra water infrastructure being physically located on the golf course property, such that the golf course is neither the "land on which [the Monterra water infrastructure] is situated" nor "a convenient space about the same or so much as may be required for the convenient use and occupation thereof." (Civ. Code, former § 3128.) And substantial evidence supports a finding that the Tehama golf course is not " 'land to be improved or benefited by the creation and use of the [improvements].' " (*Cal. Corrugated*, *supra*, 220 Cal. at pp. 106.) The purpose of the Monterra water infrastructure is to supply water and sewage services to Monterra. (See *Anselmo*, *supra*, 219 Cal. at p. 298 [scope of lien "must take into consideration the intended use for which the [improvement] is erected."].)

Defendants argue that the golf course should be included in the Water Lien allocation because it "receives reclaimed water from the Water Lien improvements that are used to irrigate the golf course." But undisputed evidence shows that Tehama pays independently for that water. The trial court could reasonably conclude that the mere purchase of greywater, at market rates, for use on the adjacent Tehama golf course does not confer any additional benefit to the golf course property beyond what it receives by purchasing the water.

16

### 3. Parcel W (High Well Water Treatment Plant)

The trial court did not discuss parcel W in its order. It is undisputed that parcel W is a utility lot on which plaintiff installed the High Well Water Treatment Plant. It is further undisputed that the Water Lien includes charges for construction of the High Well Water Treatment Plant. The parties stipulated that the plant "is currently providing water to the customers of the Cañada Woods Water Company whose service area contains the 171 lots within Monterra, the 42 lots of inclusionary housing, and 10 lots within Cañada Woods North." Williams testified that the parcel W land is necessary for use of the treatment plant.

We agree with defendants that parcel W must be included in the Water Lien allocation. A mechanic's lien attaches to "the work of improvement and the land on which it is situated together with a convenient space about the same or so much as may be required for the convenient use and occupation thereof." (Civ. Code, former § 3128.) The High Well Water Treatment Plant is part of the Monterra water infrastructure and is located on parcel W. The plant is therefore an on-site improvement on parcel W that must be included in the Water Lien allocation.

Plaintiff contends parcel W should not be included because "the improvements on [parcel W] do not provide water to" that parcel. But the parcel was improved by virtue of the water infrastructure built on it, even if that infrastructure ultimately serves different property. Given that the treatment plant is an on-site improvement, we find the cases plaintiff cites about off-site improvements inapposite.

### 4. Water Company Parcel Next to Lot 69

Defendants argue the same parcel W analysis applies to a water company parcel next to lot 69. The analysis differs, however, because substantial evidence supports a finding that costs associated with the water tanks were not included in the Water Lien. But we conclude nonetheless that the water company parcel must be included in the Water Lien allocation.

17

The trial court found that work on four water tanks near lot 69 was not part of the Water Lien. The court found, based on defense expert Strombom's report in the first trial, that work included in the liens at issue occurred between September 2007 and March 2008, and that plaintiff constructed the four tanks before that date range. Two tanks serve Monterra. The other two were paid for by Tehama and serve the Tehama lots. The trial court's factual findings are supported by substantial evidence, namely evidence showing the last charge related to the water tanks occurred in 2006 and defense expert Strombom's report in the first trial which indicated the work included in the Water Lien occurred in 2007 and 2008. Defendants' argument that "the Water Lien improvements include the construction of four 'high well tanks' " ignores that evidence.

But whether the Water Lien included charges for the water *tanks* does not conclusively resolve whether the water company *parcel* on which they sit must be included in the Water Lien allocation. Under the Civil Code section in effect when plaintiff recorded the Water Lien, a " 'work of improvement' means the entire structure or scheme of improvement as a whole." (Civ. Code, former § 3106.) A mechanic's lien attaches to "the work of improvement and the land on which it is situated." (Civ. Code, former § 3128.) Whether those sections authorize a mechanic's lien to attach to a parcel on which part of a comprehensive work of improvement is located even if the mechanic's lien did not include charges for construction on that specific parcel is a question of statutory interpretation that we review de novo. (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.)

The trial court concluded in the first trial that the " 'Monterra project was a single work of improvement for purposes of determining the validity and the timeliness of the liens asserted.' " (*CDC I*, *supra*, 48 Cal.App.5th at p. 517 [quoting the trial court].) It is undisputed that the two Monterra water tanks on the water company parcel next to lot 69 were constructed as part of the Monterra work of improvement. Civil Code former sections 3106 and 3128 contain no requirement that a mechanic's lien be limited to

18

parcels related to the specific charges in the mechanic's lien.  Instead, they indicate a mechanic's lien attaches to the land on which the "scheme of improvement as a whole" is located.  (Civ. Code, former §§ 3106, 3128.)  Because the Monterra water tanks on the water company parcel next to lot 69 were constructed as part of the Monterra work of improvement, that parcel is land on which the Monterra work of improvement is located and therefore must be included in the Water Lien allocation.

### 5.  23 Tehama Lots Identified by Defendants

The trial court found the "Tehama lots served by the two water tanks for which Tehama paid are not a portion of the single work of the Monterra improvement and are not subject to the water lien at issue here."  Those lots appear to be the same lots defendants assert "Williams admitted are directly served by the High Well Treatment Plant and other Water Lien infrastructure."

Williams testified that plaintiff constructed four water tanks on a water company parcel next to lot 69.  Two were paid for by Monterra to serve Monterra; two were paid for by Tehama to serve Tehama.  They are "commingled by tap but they were metered water in, water out, so you kept track of whose water was stored in the tanks."  Defense counsel asked Williams if "the lot 69 tanks would serve all of the mustard color lots in Tehama," without differentiating between the Tehama versus Monterra tanks.  Williams responded, "Yes."  Defense counsel then asked, "And it would serve all of the green lots in Tehama that are south of the golf course parcel, correct?," to which Williams answered, "Yes."  Defense counsel then asked, "And it would serve all of the red lots that go along that boundary, correct?"  Williams testified "it's serving maybe the upper half of red."

The foregoing supports the trial court's conclusion that the Tehama lots are served by the Tehama water tanks such that they derive no benefit from the Monterra work of improvement.  Williams made clear that Tehama paid for two of the water tanks on the water company parcel next to lot 69, and that the four tanks are metered allowing the

19

water company to differentiate between water owned by the two developments. In questioning Williams about Tehama lots served by water tanks on the water company parcel next to lot 69, defense counsel asked Williams generically about "the lot 69 tanks" but did not specify whether counsel was referring to the Tehama tanks or the Monterra tanks. The trial court could reasonably conclude that Williams's testimony about Tehama lots served by water tanks on the water company parcel referred to the Tehama tanks and not the Monterra tanks.

## D. NO ABUSE OF DISCRETION IN EXCLUDING DEFENDANTS' EXPERT

The trial court excluded testimony from defendants' accounting expert at the remand trial, finding the testimony was irrelevant because the expert did not follow the *CDC I* court's instructions about recalculating the liens to subtract sums associated with contractual interest. We review that evidentiary decision for abuse of discretion (*People v. Kelly* (1992) 1 Cal.4th 495, 523), while whether the trial court correctly interpreted *CDC I* is a question of law we review de novo. (*Ayyad v. Sprint Spectrum, L.P.* (2012) 210 Cal.App.4th 851, 859.) "When, as in this case, the reviewing court remands the matter for further proceedings, its directions must be read in conjunction with the opinion as a whole." (*Ibid.*)

### 1. The Trial Court's 2013 Statement of Decision

The trial court concluded in its 2013 statement of decision following the original trial that the combined total amount of the liens was $2,283,337.65. The trial court took that calculation from exhibit D-597 from the first trial, which was a report by plaintiff's trial expert Ingraham. That exhibit indicates $1,409.74 in the final column, "Accrual interest carried to next month." The exhibit was created in response to the trial court's direction to "calculat[e] interest at 10% per annum commencing sixty days after the end of the month in which the work was performed and an application of payments first to interest accrued and then to principal as of the date of the checks."

20

## 2. The Decision in *CDC I*

The *CDC I* court determined that because Monterra LLC made payments to plaintiff on account, plaintiff had "discretion to apply the payments 'toward the extinction of any obligation' so long as the application was made 'within a reasonable time' after the payments were received. ([Civ. Code,] § 1479, subd. Two.)" (*CDC I, supra*, 48 Cal.App.5th at p. 505.) *CDC I* found "substantial evidence to support the trial court's finding that plaintiff did not actually apply Monterra LLC's payments to specific categories of work until plaintiff prepared the liens at issue here," and found plaintiff's "application of payments on account is permissible." (*CDC I*, at p. 505.) *CDC I* also found, "Substantial evidence supports the trial court's decision that an oral contract existed with the following essential features: plaintiff and Monterra LLC agreed to pay interest on past-due invoices; the interest rate would be 10 percent; and interest would accrue '60 days from the last day of the month in which the work was performed.' " (*CDC I*, at p. 518.) But the *CDC I* court determined that the liens could not include contractual interest because the trial court "found that the reasonable value of the liened work equaled the contract price without interest for that work, and the contractual interest provision added no additional value to the liened work." (*CDC I*, at p. 521.) After determining the appellate record was insufficiently developed to decide whether interest remained in the liens, the *CDC I* court directed the trial court to "recalculate the amount of the Site Improvement Lien and Water Lien after subtracting sums associated with any contractual interest included in the liens as a result of Monterra LLC's agreement to pay plaintiff contractual interest." (*CDC I*, at p. 527.)

## 3. Testimony at the Remand Trial

At the remand trial, plaintiff's forensic accounting expert Vanessa Hill testified that she reviewed the trial court's statement of decision from the first trial as well as expert Ingraham's testimony in the first trial. The trial court had instructed the experts in the first trial to apply payments first to interest and then to principal, and that was Hill's

21

understanding of what Ingraham did in creating the spreadsheet admitted as exhibit D-597 in the first trial. The amount of unpaid contractual interest in exhibit D-597 was $1,409.74. Hill then explained how she removed that contractual interest and recalculated the lien amounts.

Defense expert Mike Zollman testified that he was directed to calculate "the contract price without interest." The court asked Zollman whether his calculations were "assuming that none of the payments that were made by Monterra should be deemed applied to interest which accrued prior to the recordation of the lien?" The court also asked, "Are you assuming that all of those payments should have been applied to principal amounts owed rather than any interest?" Zollman responded, "This excludes interest completely."

The trial court granted plaintiff's motion to strike Zollman's testimony, reasoning: "The Court of Appeal made it very clear that the payments, because they were made on account, could be applied, the principal or interest, and this is prior to recordation of the lien, the Court of Appeal found that the agreement for contractual interest was valid, it did not find otherwise, and that the payments made prior to the recordation of the lien could be applied to interest at the option of the creditor, CDC, because the debtor, Monterra, did not request that they be applied otherwise. And at the time the lien was recorded any interest then owing contractually was to be excluded. It did not say to go back and remove all the interest that had ever been charged or paid by Monterra, prior to the recordation of the lien." The trial court thus found that Zollman's analysis was irrelevant because he incorrectly assumed he "was at liberty to go back and to remove all the interest that had ever been paid by Monterra prior to recordation of the lien," which was "simply not on the table here."

### 4. The Testimony was Properly Excluded

The trial court correctly interpreted *CDC I.* The 2013 statement of decision relied on the Ingraham report, which had been created in response to the trial court's directive

22

to calculate interest and then apply payments first to interest and then to principal. *CDC I* found that plaintiff's application of payments did not violate Civil Code section 1479. (*CDC I*, *supra*, 48 Cal.App.5th at p. 505.) It also found that an oral contract to pay contractual interest existed between Monterra and plaintiff. (*CDC I*, at p. 518.) *CDC I* remanded with directions to subtract "sums associated with any contractual interest *included in the liens*." (*CDC I*, at p. 527, italics added.) When read in conjunction with the opinion as a whole, the instructions required the parties to remove contractual interest remaining in the liens but did not authorize the parties to recalculate the balances due before the liens were recorded to remove any and all contractual interest.

Defendants' belief that *CDC I* authorized them to remove any contractual interest ever charged to Monterra finds no support in the appellate opinion. Zollman testified he was directed to calculate "the contract price without interest" and that his calculations "exclude[d] interest completely." Because Zollman's opinion did not comport with the remand instructions from *CDC I*, the trial court did not abuse its discretion in excluding it.

E. **NO ABUSE OF DISCRETION IN IMPOSING DISCOVERY SANCTIONS**

Defendants refused two requests for admission before the remand hearing. The first asked defendants to admit: "Superior Court Judge Thomas Wills held, as stated in the Statement of Decision filed on December 12, 2013 in this CASE, that the amount due to Plaintiff under the CONTRACT between Plaintiff and Monterra Ranch Properties, LLC as of March 31, 2008 was the sum o[f] $2,283,337.65." The second asked defendants to admit: "The sum of $2,283,337.65 as described in Admission No. 1 contained unpaid interest in the amount of $1409.74."

"If a party fails to admit the genuineness of any document or the truth of any matter when requested to do so under this chapter, and if the party requesting that admission thereafter proves the genuineness of that document or the truth of that matter, the party requesting the admission may move the court for an order requiring the party to

23

whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees." (Code Civ. Proc., § 2033.420, subd. (a).) The trial court "shall make this order unless," among other exceptions not at issue here, the party "failing to make the admission had reasonable ground to believe that that party would prevail on the matter." (*Id*., subd. (b), (b)(3).) A trial court's order under Code of Civil Procedure section 2033.420 is reviewed for abuse of discretion. (*Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, 753.) Defendants challenge plaintiff's entitlement to sanctions; they have not challenged the reasonableness of the amount ordered.

The 2013 statement of decision concluded the combined total of the two liens was $2,283,337.65. As the *CDC I* court explained, that amount was the parties' contract price with some amount of contractual interest. (*CDC I*, 48 Cal.App.5th at p. 521 ["rather than awarding plaintiff the 'reasonable value' of the liened work—which the court found was equal to the contract price without interest—as required by [Civ. Code] former section 3123, the trial court added contractual interest to the reasonable value."].) The only relevant evidence offered at the remand hearing showed that the amount of contractual interest contained in those liens was $1,409.74. Defendants offered no relevant evidence to call either of those sums into question, much less to support an alternative calculation. Defendants thus failed to demonstrate a reasonable ground to believe that they would prevail on the matter. The trial court did not abuse its discretion.

Defendants attempt to parse the language of the first request for admission, arguing they did not admit it because it would have required them to "accept its faulty premise that any sum awarded was based on a contractual theory." But *CDC I* concluded substantial evidence supported the trial court's finding that the reasonable value of the liened work equaled the contract price without interest. (*CDC I*, 48 Cal.App.5th at p. 521.) The lien total listed in the first request for admission was indeed an "amount due

24

to Plaintiff under the CONTRACT between Plaintiff and Monterra Ranch Properties, LLC."

Defendants argue they "reasonably believed, and continue to believe, that the expert testimony of Mike Zollman regarding the amount of interest that was and could be included as part of the mechanic's lien judgment follows a proper reading of the Court of Appeal Ruling." (Citing *Orange County Water Dist. v. The Arnold Engineering Co.* (2018) 31 Cal.App.5th 96, 117 ["a party may reasonably deny [a request for admission] based on credible expert opinion evidence, even where the expert opinion evidence is not ultimately believed by the trier of fact."].) As we have discussed, Zollman's opinion was not based on a correct interpretation of the opinion in *CDC I*. It was therefore not credible expert opinion evidence and does not provide a reasonable ground to deny the second request for admission.

Defendants contend the requests for admission were "contrary to [defendants'] own legal positions in the case." They speculate that "if this Court of Appeal believed that the amount of contractual interest to be deducted from the ultimate lien amounts was calculable from the record evidence adduced at the original trial, it would not have remanded that issue to the trial court for further proceedings." But *CDC I* explained that the matter would be remanded because "the trial court never made a finding that no contractual interest remained in the liens" and "the record [was] insufficiently developed for us to decide the issue on appeal." (*CDC I*, 48 Cal.App.5th at p. 521.) Although the requests for admission were doubtless contrary to defendants' legal positions, defendants ultimately did not produce relevant evidence to support those legal positions.

### III. DISPOSITION

In case No. H050094, the judgment is modified as follows: The Water Lien must be reallocated across 183 lots, consisting of: the 171 Monterra lots, 10 lots in Cañada Woods North added by stipulation, parcel W, and the water company parcel with water tanks next to lot 69. The Water Lien total of $2,149,347.90 divided by 183 lots yields a

25

lien allocation of $11,745.07 per lot. $11,745.07 multiplied by the 58 remaining lots still at issue in the case yields a total of $681,214.06 for the Water Lien. Prejudgment interest of seven percent per annum runs from June 26, 2009 to February 18, 2014. $681,214.06 multiplied by 0.07 yields $47,684.98 in annual prejudgment interest for the Water Lien. $47,684.98 divided by 365 days per year yields $130.64 in daily prejudgment interest. $130.64 in daily interest multiplied by 1,698 days between June 26, 2009 and February 18, 2014 yields $221,826.72 in total prejudgment interest for the Water Lien. $221,826.72 added to $681,214.06 yields a total judgment of $903,040.78 for the Water Lien. $903,040.78 divided by the 58 remaining lots yields $15,569.67 in Water Lien liability per lot. As so modified, the judgment is affirmed.

In case No. H050530, the order is affirmed.

Plaintiff is awarded its appellate costs. (Cal. Rules of Court, rule 8.278(a)(3).)

_____

Grover, J.

**WE CONCUR:**



_____

Greenwood, P. J.




_____

Lie, J.




H050094, H050530 - *Carmel Development Company v. Monterra Ranch Properties, LLC et al.*